Filed 3/28/24  OC Media Tower v. Galuppo CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| OC MEDIA TOWER, L.P. et al., | |
| Plaintiffs and Respondents, | G062372 |
| v. | (Super. Ct. No. 30-2021-01227550) |
| LOUIS GALUPPO et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from a judgment of the Superior Court of Orange County, Melissa R. McCormick, Judge.  Affirmed.

G10 Law and Daniel T. Watts for Defendants and Appellants.

Rutan & Tucker, Alejandro S. Angulo, Michael Malakouti and Joelle Leib for Plaintiffs and Respondents.

\*        \*        \*

Strategic Lawsuits Against Public Participation (SLAPP suits) are meritless lawsuits designed to harass parties for engaging in protected activities (the right of petition or free speech). (Code Civ. Proc., § 425.16.)[1] A party can move to dismiss a SLAPP suit by filing an anti-SLAPP motion. The movant must show the purported SLAPP suit arises from its protected activities; if shown, the respondent can defeat the motion by showing its lawsuit has merit. This is an appeal by a lawyer, Louis Galuppo, and his firm G10 Galuppo Law (collectively, Galuppo), from a trial court's denial of their anti-SLAPP motions.[2]

Plaza Del Sol Real Estate Trust (Plaza) made $67 million in loans to OC Media Tower, L.P., and OCR Land LLC (collectively, OC Media). The loans were secured by deeds of trust and promissory notes in which OC Media agreed to pay Plaza's attorney fees for any needed collection efforts. OC Media defaulted on its loans. Plaza agreed to accept a lower payoff amount (about $50.5 million), contingent on OC Media selling its encumbered real estate. During escrow, Galuppo submitted an invoice stating its fees (about $25,000) for its client Plaza. At the close of escrow, Plaza was paid the agreed upon payoff amount and Galuppo was paid its stated attorney fees.

Plaza later filed a complaint against OC Media for fraud and other causes of action. Plaza alleged it learned after the close of escrow that OC Media had made false statements about its real estate sale to induce Plaza to accept less than what it was owed. OC Media filed a cross-complaint against Plaza and Galuppo for fraud and another cause of action. OC Media alleged Galuppo's attorney fees were false and unsupported.

Galuppo filed an anti-SLAPP motion to dismiss OC Media's cross-

---

[1] Further undesignated statutory references are to the Code of Civil Procedure.

[2] Appellants also include Galuppo's client, Lynn V. Hodge as trustee of the Park Del Sol Real Estate Trust, and the trust beneficiary, Morris Cerullo World Evangelism, Inc. Each of the four appellants filed an anti-SLAPP motion, the denial of which is the subject of this appeal.

complaint. Galuppo asserted its invoice stating Plaza's attorney fees was a prelitigation demand for payment (protected petitioning activity). The trial court denied Galuppo's anti-SLAPP motion because "an allegedly false invoice for payment generally does not constitute petitioning activity under the anti-SLAPP statute." We agree.

In an anti-SLAPP motion, "the trial court should distinguish between (1) speech or petitioning activity that is mere *evidence* related to liability and (2) liability that is *based on* speech or petitioning activity." (*Graffiti Protective Coatings, Inc. v. City of Pico Rivera* (2010) 181 Cal.App.4th 1207, 1214–1215 (*Graffiti*).)

Here, the record does not support Galuppo's assertion that its invoice was a prelitigation demand for payment. Further, the basis of OC Media's cross-complaint is not that Galuppo made a tortious demand for payment. Rather, OC Media claims the amount of attorney fees actually billed by Galuppo was fraudulent; the invoice is merely evidence to support OC Media's cross-complaint. Thus, we affirm the trial court's judgment denying the anti-SLAPP motions.


I

FACTS AND PROCEDURAL BACKGROUND

In 2014, Plaza loaned OC Media $27 million for the purchase of property located at the site of the old Orange County Register building at 625 N. Main. The parties had a long-term lender/borrower relationship. In exchange, Plaza received a promissory note and a deed of trust. The note provided OC Media would pay Plaza: "Reasonable costs of collection . . . and attorneys' fees paid or incurred in connection with the collection or enforcement of this Note, whether or not suit is filed."

In 2016, Plaza loaned OC Media $34 million for two remaining parcels at 625 N. Main totaling about 20 acres. Plaza received another promissory note and deed of trust as collateral. The note provided OC Media would pay Plaza "any and all costs or

3

expenses paid or incurred . . . in connection with this Note, Deed of Trust or any other loan documents, including, but not limited to, any and all attorneys' fees . . . whether or not suit is filed." Plaza later made an additional loan of $6 million to OC Media in connection with the 625 N. Main properties.

In 2018, OC Media stopped making interest payments on the three outstanding loans and the unpaid principal balances of $67 million became due. The parties executed loan extension agreements.

In July 2019, OC Media represented to Plaza that it had found a buyer for the 625 N. Main properties, Alliant Strategic Investments II, LLC (Alliant). In a September 2019 letter, Plaza agreed to accept $60 million from OC Media as a payoff of the three outstanding loans.

In March 2020, OC Media represented to Plaza that Alliant was now only willing to pay $50,551,325 for the 625 N. Main properties. Plaza agreed to accept that amount as a payoff of the three outstanding loans. The parties memorialized their agreement by signing a payoff demand statement.[3]

On October 19, 2020, Galuppo e-mailed documents to the title insurance company handling the sale of the 625 N. Main properties, including wiring instructions for the transfer of funds at the close of escrow. In a document labelled "INVOICE NO: 500505," Galuppo billed $24,433.08 in attorney fees for its client Plaza. The invoice did not state the number of hours billed. (See Appendix.)

Three days later, OC Media closed escrow on the 625 N. Main properties. Plaza received $50,551,325 and Galuppo received $24,433.08.

---

[3] "'Payoff demand statement' means a written statement . . . setting forth the amounts required . . . to fully satisfy all obligations secured by the loan that is the subject of the payoff demand statement." (Civ. Code, § 2943, subd. (a)(5).)

*Court Proceedings*

Plaza later filed a complaint against OC Media, its owner Michael F. Harrah, his other entities, and the title insurance company. Plaza sued for fraud (intentional misrepresentation) and related causes of action. Plaza alleged the purported sale of the 625 N. Main properties to Alliant was a sham. Plaza stated that it learned after the close of escrow that the actual purchaser was Amazon, which had bought only a portion of OC Media's properties for $63.21 million. Plaza alleged OC Media and the other defendants had conspired to conceal the Amazon deal from Plaza so it would agree to accept less than what it was owed.

OC Media filed a cross-complaint against Plaza and Galuppo for fraud and money had and received. OC Media alleged the attorney fees Galuppo had billed to its client Plaza were false and unsupported.

Appellants each filed an anti-SLAPP motion to strike (dismiss) OC Media's cross-complaint. The trial court denied the motions. The proceedings are summarized in the discussion section of this opinion.


II

DISCUSSION

Appellants claim the trial court erred in denying the anti-SLAPP motions because "the demand for $24,433.08 in attorney fees was a communication preparatory to and in anticipation of filing litigation." We disagree.

In an anti-SLAPP motion, the movant bears the burden of establishing the challenged claims arise from its protected activity; if the movant met its burden, then the respondent has the burden to establish that its challenged claims have at least "'minimal merit.'" (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1061, 1067 (*Park*).) An appellate court reviews de novo whether a trial court's ruling on

5

an anti-SLAPP motion constitutes error. (*Geiser v. Kuhns* (2022) 13 Cal.5th 1238, 1250.)

In the remainder of this discussion, we shall: A) review relevant legal principles regarding anti-SLAPP motions; B) summarize the underlying proceedings; and C) analyze the relevant laws as applied to the facts in this case.

## A. *Legal Principles*

"A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech . . . shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) An "'act in furtherance of a person's right of petition . . .' includes: (1) any written or oral statement or writing made before a legislative, executive, or *judicial proceeding*, or any other official proceeding authorized by law . . . ." (§ 425.16, subd. (e), italics added.)

"The anti-SLAPP protection for petitioning activities applies not only to the filing of lawsuits, but extends to conduct that relates to such litigation, including statements made in connection with or in preparation of litigation." (*Kolar v. Donahue, McIntosh & Hammerton* (2006) 145 Cal.App.4th 1532, 1537.)

"Prelitigation communications may constitute protected activity, but only if those communications are 'relate[d] to litigation that is contemplated in good faith and under serious consideration.' [Citation.] Litigation is not '"under [serious] consideration"' if it is only a '"possibility."'" (*People ex rel. Allstate Ins. Co. v. Rubin* (2021) 66 Cal.App.5th 493, 499 (*Rubin*).) "'Thus, for example, when a cause of action arises from conduct that is a "necessary prerequisite" to litigation, but will lead to litigation only if negotiations fail or *contractual commitments are not honored*, future litigation is merely theoretical rather than anticipated and the conduct is therefore not protected prelitigation activity.'" (*Ibid.*, italics added.)

6

"A claim *arises from* protected activity when that activity underlies or forms the basis for the claim." (*Park*, *supra*, 2 Cal.5th at pp. 1062–1063, italics added.) "In short, in ruling on an anti-SLAPP motion, courts should consider the elements of the challenged claim and what actions . . . supply those elements and consequently form the basis for liability." (*Id.* at p. 1063.) A court reviews the parties' pleadings, declarations, and other supporting documents """"to determine what conduct is actually being challenged, not to determine whether the conduct is actionable.""" (*Talega Maintenance Corp. v. Standard Pacific Corp.* (2014) 225 Cal.App.4th 722, 727–728.)

"The essential elements of fraud that give rise to a cause of action for deceit or intentional misrepresentation are: (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or scienter); (c) intent to defraud, i.e., to induce reliance; (d) actual and justifiable reliance; and (e) resulting damage." (*Berry v. Frazier* (2023) 90 Cal.App.5th 1258, 1268.) A common count of money had and received is available "'wherever one person has received money which belongs to another, and which in equity and good conscience should be paid over to the latter.'" (*Gutierrez v. Girardi* (2011) 194 Cal.App.4th 925, 937.)

"In deciding whether an action is a SLAPP, the trial court should distinguish between (1) speech or petitioning activity that is mere *evidence* related to liability and (2) liability that is *based on* speech or petitioning activity. Prelitigation communications . . . may provide evidentiary support for the complaint without being a basis of liability. An anti-SLAPP motion should be granted if liability is based on speech or petitioning activity itself." (*Graffiti*, *supra*, 181 Cal.App.4th at pp. 1214–1215; *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 78 ["That a cause of action arguably may have been triggered by protected activity does not entail that it is one arising from such"].)

*B.  The Cross-Complaint and Anti-SLAPP Motion*

OC Media and OCR Land LLC filed a cross-complaint against Plaza, Galuppo, and Morris Cerullo World Evangelism for fraud and the common count of money had and received.  OC Media alleged that prior to the close of escrow it had asked Galuppo "to provide *the amount* of attorneys' fees and costs that [Plaza] had incurred in connection with the sale of the Property [at 625 N. Main]."  (Italics added.)  OC Media stated that on October 16, 2020, Galuppo "transmitted by email a document purporting to be an invoice through which it was represented that [Plaza] had incurred $24,433.08 in legal fees."  OC Media alleged: "The purported invoice does not identify the hourly rates charged to [Plaza] and does not state the number of hours each timekeeper billed to [Plaza].  Further, [OC Media's] request for a detailed invoice was ignored by Galuppo and Galuppo Law."

OC Media further alleged in its cross-complaint:  "At the time the invoice was transmitted, [Galuppo] knew that it falsely represented the fees that [Plaza] had allegedly incurred at Galuppo Law in connection with the sale of the [625 N. Main properties]."  OC Media stated:  "Because time was of the essence to close the sale . . . , [OC Media] relied on the truthfulness of the invoice and caused the invoice to be paid through the escrow of the sale of the [625 N. Main properties]."

Appellants filed anti-SLAPP motions asserting the invoice for Plaza's attorney fees was a prelitigation demand for payment.  In support of the motions, Galuppo stated that after OC Media failed to make payments to Plaza on the outstanding $67 million loans, Plaza hired Galuppo "to enforce its rights and collect under the promissory notes."  Galuppo asserted it considered several legal options, including filing an action for breach of contract and/or filing an action for judicial foreclosure.  Galuppo stated:  "The 'invoice' [OC Media] allege[s] to be 'fraudulent' was sent by [Galuppo] as a prelitigation demand for payment of attorney fees to which [Plaza] was entitled under

8

promissory notes and deeds of trust. These demands were part of an ongoing series of prelitigation demands sent by Plaza and their attorneys in an attempt to resolve outstanding legal disputes with [OC Media] before resorting to litigation."

In support of the anti-SLAPP motions was a declaration by Louis Galuppo, the managing shareholder of the Galuppo law firm. Mr. Galuppo averred that the documents sent by the law firm on October 16, 2020, were e-mailed to the title insurance company handling the closing of the 625 N. Main properties. Mr. Galuppo described the invoice as both an "'invoice'" listing Plaza's attorney fees, as well as a "'payoff demand regarding loans.'" Mr. Galuppo stated: "In normal and due course, the demands were sent as part of an anticipated work-out between the parties to avoid the necessitation of legal action."

Mr. Galuppo alleged: "During the relevant period in which the $24,433.08 in fees was incurred, our client seriously contemplated filing a legal action and resorting to litigation to collect from [OC Media] on the notes which were in default. *If we had not received the $24,433.08 in closing*, or other requisite action by [OC Media] under the contemplated workout, *we would have initiated an action*; there is no doubt that our client would have prevailed in the litigation." (Fn. omitted, italics added.) Attached as an exhibit to the anti-SLAPP motion was an internal memo written prior to the close of escrow discussing options for the recovery of Plaza's loans to OC Media (judicial foreclosure, etc.). Also attached to Galuppo's anti-SLAPP motion was a document listing the time entries totalling 133 hours for various tasks performed by Galuppo on behalf of its client, Plaza.

Following a hearing, the trial court denied appellants' anti-SLAPP motions to dismiss or strike OC Media's cross-complaint in a written order: "The submission of an allegedly false invoice for payment generally does not constitute petitioning activity under the anti-SLAPP statute, at least without circumstances showing litigation was more

9

than theoretical and was genuinely contemplated. [Citation.] Cross-defendants have not demonstrated litigation was genuinely contemplated and was more than a possibility at the time the invoice amount was communicated. Cross-defendants thus have not established that cross-complainants' claims or the other challenged portions of the cross-complaint arise from cross-defendants' protected petitioning activity. In light of this conclusion, the court need not reach step two of the analysis under the anti-SLAPP statute."

*C. Application and Analysis*

An attorney's submission of a claim for a contractual payment on behalf of his or her client ordinarily does not establish sufficient evidence of protected prelitigation conduct under the anti-SLAPP statute. (*People ex rel. Fire Ins. Exchange v. Anapol* (2012) 211 Cal.App.4th 809 (*Anapol*).) In *Anapol*, two insurance companies filed a qui tam action against two attorneys for insurance fraud.[4] The companies alleged the attorneys knowingly submitted fraudulent wildfire insurance damage claims on behalf of their clients. (*Id.* at pp. 817–818.) The attorneys filed anti-SLAPP motions arguing the "submission of claims constituted prelitigation negotiations to settle the smoke and ash claims without the need of lawsuits." (*Id.* at p. 819.) The trial court found the attorneys' conduct as alleged in the complaint did not establish protected prelitigation activity and denied the attorneys' anti-SLAPP motions. (*Id.* at p. 821.)

The appellate court agreed, reasoning that "submitting an insurance claim in the usual course of business does not constitute prelitigation conduct, but circumstances may exist such that submitting the claim is protected prelitigation conduct." (*Anapol*, *supra*, 211 Cal.App.4th at p. 821.) The court stated that it could

---

[4] A qui tam action is "'brought under a statute that allows a private person to sue for a penalty, part of which the government or some specified public institution will receive.'" (*People ex rel. Allstate Ins. Co. v. Weitzman* (2003) 107 Cal.App.4th 534, 538.)

10

"envision circumstances in which an insurance claim is submitted in anticipation of litigation contemplated in good faith and under serious consideration. For example, a claim may be submitted after *informal* negotiations with the insurance company have proven unfruitful, and the insured has already decided to bring suit on the policy." (*Id*. at p. 827.) However, the court found that the two attorneys' assertions that they *intended* to file lawsuits *if* the insurance companies failed to honor their clients' wildfire insurance claims did not establish such unusual circumstances: "We believe that an insurance claim cannot be transformed from a simple claim for payment submitted in the usual course of business into protected prelitigation conduct solely on the basis of the subjective intent of the attorney submitting the claim . . . . Whether a particular insurance claim constitutes a . . . prerequisite for litigation should not turn on the experience and uncommunicated opinion of the attorney." (*Id*. at p. 829.)

Here, similar to the attorneys' insurance claims in *Anapol*, the record does not support Galuppo's assertion that the invoice stating Plaza's attorney fees constituted a demand for payment in advance of litigation that was under serious consideration.

On October 19, 2020, Galuppo e-mailed its invoice stating Plaza's attorney fees, as well as the escrow instructions, to the title insurance company handling the sale of the 625 N. Main properties. None of those documents included a demand for payment or any mention of litigation. It appears that OC Media's payment of Plaza's attorney fees was assumed. Although Mr. Galuppo averred in the anti-SLAPP motion that *he intended* to file a lawsuit, that was only in the hypothetical event that OC Media failed to honor its contractual obligation to pay Plaza's attorney fees: "If we had not received the $24,433.08 . . . , we would have initiated an action."

Mr. Galuppo's declaration further noted that the invoice for Plaza's attorney fees was e-mailed to the title insurance company, rather than to OC Media or to any of its related entities. It seems to us that if a law firm was truly e-mailing a document

11

intended as a prelitigation demand for payment, it would likely e-mail that document to the party that would ultimately be sued if payment was not forthcoming (i.e., OC Media), rather than to a third party (i.e., the title insurance company). It appears Galuppo e-mailed the invoice to the title insurance company with the apparent intent to expedite the payment of Plaza's attorney fees through the escrow proceeds. It does not appear Galuppo e-mailed the invoice to the title insurance company with the unstated intent that it was to be understood by OC Media as a prelitigation demand for payment.

We find Mr. Galuppo's subjective intent to file a lawsuit in the event OC Media breached its contractual obligations was merely theoretical (i.e., it was not under serious consideration); therefore, Galuppo's e-mailing of the invoice to the title insurance company was not protected prelitigation activity under the anti-SLAPP statute. (See *Rubin*, *supra*, 66 Cal.App.5th at p. 499 ["conduct that . . . will lead to litigation *only if . . . contractual commitments are not honored* . . . is merely theoretical rather than . . . protected prelitigation activity"], italics added.)

In sum, we agree with the trial court that the causes of action in OC Media's cross-complaint (fraud and money had and received) do not arise from Galuppo's protected petitioning activities. Thus, we need not reach step two of the analysis, and we affirm the court's denial of appellants' anti-SLAPP motions.

Appellants argue in their opening brief that: "The cross-complaint accuses [Galuppo] of sending demands for payment to [OC Media]." We disagree.

The basis of OC Media's claim is not that Galuppo is liable because it *demanded payment* for Plaza's attorney fees (e.g., civil extortion). Indeed, OC Media acknowledged in its cross-complaint that it was obligated to pay Plaza's attorney fees under the terms of the promissory notes. Rather, OC Media's claim is that *the amount* of attorney fees Galuppo purportedly billed to Plaza were false, and not supported by its

12

$24,433.08 invoice.[5]  That is, the invoice is not the alleged basis of Galuppo's liability; the invoice is merely evidence to support OC Media's claim of fraud.  (*Graffiti*, *supra*, 181 Cal.App.4th at pp. 1214–1215 ["Prelitigation communications . . . may provide evidentiary support for the complaint without being a basis of liability"].)

Galuppo also argues:  "In demands made to [OC Media's] owner, Mike Harrah, and [OC Media's] attorneys, the looming threat of litigation was clear.  If the parties could not resolve their disputes over the unpaid loans and attorney fees, [Plaza] would file suit."  Similarly, in Mr. Galuppo's declaration he averred that the invoice for attorney fees "were part of an ongoing series of prelitigation demands and collection efforts sent by my clients and their attorneys, including myself, in an attempt to resolve outstanding legal disputes with [OC Media]."

But Galuppo's assertions regarding its "series of prelitigation demands and collection efforts" purportedly communicated to OC Media prior to its e-mailing of the invoice to the title insurance company on October 19, 2020, are unsubstantiated.

The record includes a September 2019 letter in which Plaza initially agreed to accept $60 million from OC Media as a payoff for its outstanding $67 million loans. Plaza's letter urged OC Media to close the sale with Alliant as soon as possible because Plaza had pressing financial obligations.  But Plaza's letter was written by its trustee, rather than by Galuppo, or any other attorney.  The record also includes an April 2020 payoff demand statement in which Plaza and OC Media agreed to a lower payoff amount of $50,551,324.  But the payoff demand statement was on Plaza's letterhead and it was not signed by an attorney.  In other words, neither of these documents appear to constitute a *prelitigation* demand for payment.  In fact, both documents were dated prior

---

[5] Galuppo's more detailed document listing Plaza's billable hours was attached to its anti-SLAPP motion, which Galuppo filed *before* it filed an answer to the cross-complaint. (See *People ex rel. Lockyer v. Brar* (2005) 134 Cal.App.4th 659, 661–662 [the filing of an anti-SLAPP motion before an answer is filed stays the trial court proceedings].)

13

to the time Galuppo started billing Plaza for its services in June 2020.

There are simply no documents in the record from Galuppo—or any other attorney representing Plaza—directed to Harrah, OC Media, or its counsel attempting "to resolve outstanding legal disputes." Indeed, Plaza stated in its initial complaint that it had a longstanding lender/borrower relationship with OC Media, which had ordinarily "repaid the money borrowed without issue."

In short, we reject Galuppo's claim that the invoice was "part of an ongoing series of prelitigation demands" communicated to OC Media as part of a lawsuit that was "'under serious consideration.'" (See *Rubin*, *supra*, 66 Cal.App.5th at p. 499 ["Litigation is not '"under [serious] consideration"' if it is only a '"possibility"'"].)

Finally, appellants cite *Geragos v. Abelyan* (2023) 88 Cal.App.5th 1005 (*Geragos*), in their opening brief to support an argument that: "Prelitigation attempts to avoid litigation are just as protected as post-filing attempts to settle a pending lawsuit." (Boldfacing omitted.) But we find *Geragos* to be inapposite.

In *Geragos*, Armen Abelyan sued his former attorneys (Geragos) for breach of contract and related claims. (*Geragos*, *supra*, 88 Cal.App.5th at pp. 1012–1013.) Abelyan's complaint alleged Geragos accepted a $2,500 fee and a $25,000 retainer, but Geragos provided no legal services. (*Ibid.*) About nine months later, Geragos filed a cross-complaint against Abelyan and his current attorney for civil extortion and related claims. (*Id.* at p. 1013.) Geragos alleged that while arranging a meet and confer regarding Abelyan's lawsuit, his current attorney "stated the Geragos Firm should return the $27,500 back to Abelyan 'or Abelyan would be immediately filing a State Bar complaint.'" (*Id.* at p. 1014.) The current attorney filed anti-SLAPP motion arguing, "the causes of action in the cross-complaint arise out of 'privileged litigation conduct' in connection with Abelyan's civil complaint and settlement discussions, and as such, the claims should be stricken under section 425.16." (*Id.* at p. 1015.)

14

The trial court granted the current attorney's anti-SLAPP motion: "As to the first prong, the court found 'it is clear that the allegations in the cross-complaint . . . depend upon a "written or oral statement . . . made in connection with an issue under consideration or review by a . . . judicial body, or any other official proceeding authorized by law."'" (*Geragos*, *supra*, 88 Cal.App.5th at pp. 1019–1020.) The trial court held that "communicative acts performed by attorneys as part of their representation of a client in a judicial proceeding '"are per se protected"' and 'settlement negotiations are "protected activity."'" (*Id.* at p. 1020.) The trial court found that although extortionate conduct is normally not protected by the anti-SLAPP statute, Geragos' evidence was "'not sufficient to meet the high burden of producing conclusive evidence of illegal activity.'" (*Ibid.*) The Court of Appeal agreed and affirmed: "It is evident on the face of the cross-complaint that [Geragos'] claims are entirely premised on . . . litigation and/or settlement communications . . . ." (*Id.* at p. 1023.)

Appellants' opening brief argues: "In *Geragos* . . . there was no threat of litigation, just a threat to file a complaint with the State Bar. The *Geragos* court held that a threat to report opposing counsel to the State Bar – when made as part of an attempt to settle a dispute that had not yet risen to litigation – still counted as protected activity under anti-SLAPP prong one." We disagree.

It appears appellants may have misunderstood the timing of the relevant facts in *Geragos*. The alleged threat by Abelyan's current attorney to file a State Bar complaint against Geragos occurred *after* the current attorney was representing Abelyan in the lawsuit Abelyan had filed against Geragos. The alleged threat was allegedly communicated by the current attorney to a Geragos attorney while arranging a meet and confer regarding the pending litigation. Consequently, the trial court found the alleged threat by the current attorney to be an integral part of his representation of his client Abelyan "in a judicial proceeding," and was therefore ""per se protected"" litigation

15

activity under the anti-SLAPP statute.  (*Geragos*, *supra*, 88 Cal.App.5th at p. 1020.)

The timing of the alleged threat in *Geragos* is markedly different from the timing of the invoice in this case.  The current attorney's alleged threat to file a State Bar complaint in *Geragos* was made *after* his client Abelyan had filed a lawsuit against Geragos.  Conversely, in this case Galuppo e-mailed its invoice for its attorney fees to the title insurance company *before* its client Plaza had filed a lawsuit against OC Media.

Consequently, the invoice e-mailed by Galuppo was not part of any "communicative acts performed by attorneys as part of their representation of a client in a judicial proceeding."  (See *Geragos*, *supra*, 88 Cal.App.5th at p. 1020.)  Additionally, OC Media is not suing Galuppo for any causes of action arising from an attorney's alleged "communicative acts" as in *Geragos* (civil extortion).  Rather, Galuppo's alleged communicative act (the invoice) is merely evidence to support OC Media's causes of action in its cross-complaint for fraud and money had and received.

To reiterate and conclude, we hold that OC Media's cross-complaint is not a SLAPP suit.  Galuppo's alleged conduct—the e-mailing of an invoice for a fraudulent amount of attorney fees prior to the serious consideration of a lawsuit—does not arise from prelitigation petitioning activities that are protected by the anti-SLAPP statute.  Thus, we affirm the trial court's denial of appellants' anti-SLAPP motions.

III

DISPOSITION

The judgment is affirmed.  Costs on appeal are awarded to OC Media.


MOORE, ACTING P. J.

WE CONCUR:


DELANEY, J.


GOODING, J.

# G10 GALUPPO LAW, APLC

A Professional Law
Corporation
2792 Gateway Rd, Ste 102
Carlsbad, CA 92009

October 16, 2020

MORRIS CERULLO WORLD EVANGELISM
PLAZA DEL SOL REAL ESTATE TRUST
Attn: Mr. Lynn Hodge
875 Hotel Circle South
San Diego, CA 92108

Re Matter:  Workout and Payoff re: 625 N. Main St. Santa Ana
1722-030

Dear Client:

On behalf of G10 Galuppo Law, APLC, again, thank you for your ongoing patronage. Our promise to you is to provide you with legal services in a competent, courteous, timely and cost efficient manner. We will endeavor to give knowledgeable legal representation and responsive service. This firm is dedicated to establishing a professional and long-term relationship with you.

We believe it is important that the fees charged be fair and reasonable in relation to the services rendered and that you understand our billing procedures. Enclosed please find invoice number 500505 for the above-referenced matter. Here is a summary of the cost of the legal services provided for your matter:

| | |
|---|---|
| Total for services rendered | 24,433.08 |
| Total expenses | 0.00 |
| Total interest and finance charges | 0.00 |
| Total payments and other transactions | 0.00 |
| Total previous balance | 0.00 |
| Total Replenishment | 0.00 |
| **Balance Due** | **24,433.08** |

The costs of our services are based primarily upon the time devoted to your matter, including consultations, correspondence, meetings, telephone calls, negotiations, factual investigations and analysis, legal research and analysis, document preparation and revision, travel away from the office on your behalf and all other work related to your matter.

We cannot fully determine the nature and extent of the legal services which may ultimately be necessary on your matter because much of our work depends upon the resources of others. Other factors taken into account are the novelty and difficulty of the issues and problems involved, the skills required to perform the services properly, the skill level and experiences of opposing counsel, the responsibility assumed, the time limits imposed by you and by the circumstances, the seriousness of the consequences, and the other considerations permitted or required by the law, custom and practice within a certain market segment and applicable rules of professional conduct.

We welcome any questions you may have concerning our legal services and the costs related to your matter. Please do not hesitate to contact us, your first point of contact should be Ms. Jill Trost. Again, Thank you.

Sincerely,

Louis A. Galuppo, Esq.
**G10 GALUPPO LAW**
**A Professional Law Corporation**

*G10 GALUPPO LAW APLC*
A Professional Law Corporation
2792 Gateway Rd, Ste 102
Carlsbad, CA 92009

(760) 431-4575
Tax ID No.: 33-0913786

MORRIS CERULLO WORLD EVANGELISM
PLAZA DEL SOL REAL ESTATE TRUST
Attn: Mr. Lynn Hodge
875 Hotel Circle South
San Diego, CA 92108

Amount Due On Receipt

| For services rendered through: | 10/16/2020 | INVOICE NO: 500505 |
|---|---|---|

## *Workout and Payoff re: 625 N. Main St.*
## *Santa Ana*
## *1722-030*

**For professional services rendered:**

    A.  Document organization, Checklist Maintenance, and Task Monitoring

    B.  Purchase and Sale Agreement Review, Comments, and Negotiations

    C.  LOI Review and Analysis

    D.  Workout Preparation Review and Analysis

    E.  Title work, Review and Analysis

    F.  Escrow Closing Activities and Organizational Support

|  | Hrs/Rate | Amount |
|---|---|---|
| Total legal fees billed |  | $24,310.05 |
| Total costs |  | $123.03 |
| Total fees and costs of this bill |  | $24,433.08 |
| Previous unpaid balance |  | $00.00 |
| **Balance Now Due** |  | **$24,433.08** |

| Current | 30 Days | 60 Days | 90 Days | 120 Days |
|---|---|---|---|---|
| 24,433.08 | 0.00 | 0.00 | 0.00 | 0.00 |

### Timekeeper Summary

Name

Louis A. Galuppo, Managing Shareholder
Elysian Kurnik, Senior Attorney
Jayne Lane, Legal Secretary

Thank you for your business!
For your convenience, we accept American Express, Visa and Mastercard.
Please call our office for further information.